UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SHANNON HOUSE, )
)
       Plaintiff, )
)
       v. ) No. 4:13 CV 2301 DDN
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security, )
)
       Defendant. )

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Shannon House for disability insurance benefits and social security income benefits under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, 1381. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff was born on November 19, 1972. (Tr. 177.) She filed her applications on July 14, 2009. (Tr. 127.) She alleged an onset date of June 8, 2009, and that she was unable to work due to depression and narcolepsy, anxiety, and sleep disorders. (Tr. 127, 134, 177-211.) Plaintiff's applications were denied and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 61-64.)

An ALJ held a hearing on August 10, 2010 and on October 7, 2010 found plaintiff was not disabled. (Tr. 21-35; 35-52.) The Appeals Council denied plaintiff's request for review on May 25, 2012. (Tr. 607.)

Thereafter, plaintiff commenced this action for judicial review. On defendant's motion, this court reversed the Commissioner's decision and remanded the case to the Social Security Administration on February 7, 2013. (Tr. 611-12.)

On March 20, 2013 the Appeals Council remanded the case to the ALJ instructing her to obtain updated medical evidence and opinion evidence from a vocational expert regarding limitations on plaintiff's occupational base. (Tr. 616-17.) Additionally, the Appeals Council consolidated plaintiff's July 23, 2012 Title II and XVI applications. (Id.)

The ALJ held a second hearing on August 19, 2013 and issued a second decision on September 26, 2013 concluding that plaintiff was not disabled. (Tr. 536-53.) The second decision of the ALJ is the final decision of the Commissioner now before the court for review.

## II.  MEDICAL AND OTHER HISTORY

On May 24, 2006, plaintiff was seen by C. Nester, M.D. at Pulmonary Sleep Consultants, Inc. due to plaintiff's inability to stay awake at work and having difficulty both falling and staying asleep. Plaintiff was referred for a sleep study, which was completed on June 2, 2006. Plaintiff was diagnosed with narcolepsy, bruxing (grinding of the teeth), periodic limb movement disorder, but no obstructive sleep apnea. Royal J. Eaton, M.D. noted plaintiff failed to wear her prescribed bruxing appliance and needed to lose weight. (Tr. 325-40.)

On September 20, October 11, and November 8, 2006, plaintiff was seen by Dr. Nester for her recurring sleep issues. Dr. Nester prescribed Xyrem, a medication for narcolepsy, and Adderall, a medication for attention deficit disorder. (Tr. 342-45.)

On February 7, 2007, Dr. Nester examined plaintiff and diagnosed narcolepsy, reflux/ulcer, and restless legs. He modified her medications. (Doc. 346.)

On April 4, 2007, Dr. Nester stated that plaintiff complained that her own behavior was abnormal (she was screaming unintelligibly), her memory was poor, she was unable to work, and her mood was poor. He noted she was visibly withdrawn and appeared

depressed. He diagnosed narcolepsy and sleep disorder. He prescribed plaintiff Zoloft, a mood disorder medication. (Tr. 347.)

On April 12, 2007, plaintiff visited Washington University's Sleep Medicine Center. Kelvin A. Yamada, M.D., who diagnosed plaintiff with narcolepsy, disrupted sleep, and excessive daytime sleepiness. He developed a plan of treatment for plaintiff. (Doc. 359-60.)

On April 26, 2007, plaintiff returned to the Sleep Medicine and Dr. Yamada noted his impressions as narcolepsy/cataplexy. Plaintiff reported significant improvement with Ambien. The plan included Amy D. Bertelson, Ph.D., investigating explanations for plaintiff's sleep behavior. (Doc. 356-57.) Dr. Bertelson examined plaintiff on June 5, 2007. She diagnosed plaintiff with narcolepsy without cataplexy, due to a medical condition. (Doc. 354-55.)

From September 10 through October 3, 2007 plaintiff saw her treating physician, Jeffery Harris, M.D., F.C.C.P. for her continued issues with insomnia and hypersomnia. Dr. Harris noted her latest medications as Klonopin, for sleep, and Ambien. Dr. Harris requested plaintiff try Dexedrine then Lunesta for her inability to sleep in order to determine which is better. (Tr. 725-27.)

On October 29, 2007, Dr. Harris wrote a letter regarding plaintiff's ability to work, given her sleep issues. He stated that "once her medications become therapeutically effective, she should be able to stay awake and function adequately in the work place." He qualified this with "[i]t may be necessary for her to take naps during short times during the day, and transportation will be an issue since she should not drive until this problem is under slightly better control." Dr. Harris stated "it may be possible for Ms. House to work with the above accommodations . . . ." Dr. Harris stated he was still adjusting her medications and "it would be my hope that she will be able to continue to work, but this may or may not be the case, depending on her clinical response to certain interventions." (Tr. 724.)

On January 10, 2008, Dr. Harris increased plaintiff's Adderall and Dexedrine. He ordered a repeat sleep study to determine whether she really had hyper-somnolence and difficulty maintaining sleep versus a purely psychosomatic problem. (Tr. 723.)

On February 4, 2008, the repeat sleep study was conducted. The overall assessment of Dr. Harris was plaintiff did not have significant obstructive sleep apnea and no significant sleep disruption from periodic leg movements. Plaintiff's sleep is initiated relatively effectively but she has slightly long sleep latency, almost indicating hypersomnia. Dr. Harris ordered another sleep study at the Mayo Clinic for a second opinion. (Tr. 225, 722.)

On May 19, 2008, Dr. Harris noted plaintiff's noncompliance with almost all of her medications for the past couple of months. Dr. Harris stated that "at this point, she does not want anything from me, and therefore, there is nothing I can do." (Tr. 721.)

On July 24, 2009, the Mayo Clinic conducted a sleep study. The Mayo Clinic ultimately diagnosed hypersomnolence, mild apnea hypopnea syndrome, periodic limb movement disorder, and insomnia. The clinician suggested that plaintiff's insomnia and hypersomnolence might be caused by depression. (Tr. 239-45, esp. 240.)

On August 21, 2008 plaintiff saw Georgia Jones, M.D., her treating psychiatrist. Dr. Jones's one-page progress notes sheet indicated that plaintiff's appearance was average, her motor activity was average, her speech was coherent and relevant, her mood was euthymic, her sleep was good, she had no suicidal or homicidal thoughts, she exhibited some anxiety, her thought process was oriented X3, she was not delusional, and her memory and insight were normal. She would need supportive psychotherapy. Dr. Jones prescribed Prestiq, an anti-depressant. (Tr. 291.)

On September 3, 2008, plaintiff saw Dr. Harris. He noted plaintiff was not using the CPAP machine, she is not taking the prescribed Mirapex, but

> [s]he is taking Ambien-CR and is sleeping from 9:00 to 3:00 and is much more alert and is not hyper-somnolent during the day, and again, I have no explanation for this. She believes that her legs got worse on the Mirapex and she does not want to take it. She believes it made her more sleepy.

- 4 -

(Tr. 280.) Dr. Harris further stated, "A very strange picture with having multiple sleep studies over the years at multiple places, and they essentially showed different things. What is clear is that she is remarkably better on fewer medicines." (Id.) Further, he wondered whether she might be bipolar and was entering the manic stage. He noted that she had a psychiatric department appointment soon. (Id.)

Between September 18, 2008 and February 11, 2009 plaintiff saw Dr. Jones three times. Dr. Jones's fill-in-the-blank notes for November 13, 2008 indicated that plaintiff's grooming and eye contact were good; her posture and gait were within normal limits; her speech was spontaneous, coherent, relevant, and logical; she exhibited no preoccupations, perceptual distortions, thought disturbances, delusions, hallucinations, ideas of reference, or suicidal ideation. Several of her entries on November 13 were unintelligible. (Doc. 289.) Similar entries were made for visits on February 11, 2009. Although some entries on her notes of the June 9, 2009, were unintelligible, other portions indicated that plaintiff was preoccupied, and had no perceptual distortions, thought disorders, or hallucinations. While she noted plaintiff had increased guilt and tension, plaintiff had reduced concentration, ability to enjoy, and ability to get started. (Tr. 287.) Dr. Jones's reports of June 23 and July 8, 2009, had similar entries. (Tr. 285, 286.)

On April 3, 2009, Dr. Harris instructed plaintiff to focus on losing weight and increasing her activity level. Additionally, Dr. Harris noted that plaintiff was not using her CPAP machine, but she is taking Ambien and is very much less depressed. He concluded she has insomnia in spite of the medications she has tried; however. He noted that Ambien is helpful. She was also diagnosed with hypersomnia for which she has "tried everything." He prescribed Dexedrine. (Tr. 278.)

On June 5, 2009, Dr. Harris prescribed Nuvigil, a medication to prevent extreme sleepiness; Astelin, an allergy medication; and prednisone and albuterol for her wheezing. (Tr. 276.)

On September 24, 2009, Nurse Practitioner Lisa Schultz completed a medical report for the Missouri Department of Social Services. She diagnosed plaintiff with narcolepsy, anxiety, and depression. Plaintiff was taking Ambien and Tranxene, both prescriptions for sleep disorders. Nurse Schultz then opined that plaintiff has a permanent disability that prevents gainful employment. (Tr. 363-64.)

On January 12, 2010 plaintiff was diagnosed with chronic rhinitis and sinusitis. (Tr. 399.) On January 26, 2010, the Washington University Asthma and Allergy Center instructed plaintiff to use a nasal saline wash in her sinuses due to her intolerance of nasal sprays. (Tr. 402.)

On April 6, 2010, Dr. Harris observed plaintiff suffered from severe depression, and in his opinion she still cannot function in the real world, but is improving. He stated her sleeping issues continue and while she will not use her CPAP, she is "theoretically on positional therapy." He believed her sleep impairments will likely worsen with her increasing weight. (Tr. 421.)

On April 26, 2010, Dr. Jones completed a disability assessment in which she stated that plaintiff is not able to sustain full time competitive employment. Dr. Jones did not give any reason for this assessment, but merely referred to her. (Tr. 433.)

From June 9, 2009 to June 24, 2010 plaintiff saw Dr. Jones sixteen times.. (Tr. 258-87, 410-19, 488-93, 971-82.)

On July 6, 2010, the Asthma and Allergy Center at Washington University diagnosed plaintiff with chronic sinusitis, but noted plaintiff's refusal to take any nasal sprays due to nausea and her noncompliance with the prescribed daily saline nasal washes. Bob Geng, M.D., prescribed Zofran for her chronic nausea. (Tr. 500-01.)

On July 22, 2010, plaintiff saw Dr. Jones and was assessed as having a Global Assessment of Functioning ("GAF") score of 35. (Tr. 514, 970.) A GAF score of 35 indicates either "some impairment in reality testing or communication" or "major

impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."[1]

On July 27, 2010, Dr. Jones completed a disability claim assessment and stated that plaintiff's symptoms include being sad, blue, hopeless, helpless, irritable, having poor focus and concentration, difficulty making decisions, and hypersomnia. Plaintiff is on medications. Dr. Jones assessed that plaintiff is unable to sustain competitive employment and has had multiple decompensations; Dr. Jones did not describe the decompensations. (Tr. 495-97.)

On September 14, 2010, Nurse Practitioner Libbs saw plaintiff for her wellness examination. She diagnosed plaintiff with restless leg syndrome, obesity, a cyst, narcolepsy, and irritable bowel syndrome. (Tr. 815-16.)

On September 23 and 30, 2010, plaintiff saw Licensed Social Worker Karen Altemueller who made detailed counseling notes. (Tr. 528.)

On October 2, 2010, Dr. Harris saw plaintiff and reported plaintiff as moderately unstable with erratic behavior and hypersomnia. He stated that she is disabled due to a combination of her sleep issues and psychiatric issues and is now unemployed. Dr. Harris, in reference to her assigned treatments, stated "she is doing very little that she has been told to do." (Tr. 423.)

On October 16, 2010 Christopher Bosche, M.D., saw plaintiff in Mercy Hospital's emergency room for depression after a denial of her first disability claim. A psychiatry counseling was cancelled and plaintiff was sent home, when she insisted she was not suicidal. (Tr. 1012-40.)

On December 2, 2010, LCSW Altemueller noted plaintiff had a severely depressed mood. (Tr. 519.)

On December 3, 2010, Kevin F. Postol, D.D.S, saw plaintiff at Sleep Disorder Dentistry, LLC, and recommended a dental device due to plaintiff's noncompliance with

---

[1] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34-35 (4th ed. 2000) ("DSM IV").

her CPAP machine for her obstructive sleep apnea. On December 27, 2010, plaintiff informed Dr. Harris that she would not buy the oral appliance because of its cost. (Tr. 18-19, 714.)

Plaintiff saw Dr. Jones nine times during 2011 for psychiatric reasons. Her notes appear to involve medication management and not counseling sessions like those conducted by LCSW Atlemueller. (Tr. 954- 63.)

On August 3, 2011, Plaintiff saw Esperanza Cleland, M.D. at the Saint Louis University Department of Internal Medicine and Pediatrics, Division of Adult and Pediatric Rheumatology. He stated that plaintiff has fibromyalgia but had normal x-rays of her lower back joints, left and right knees, right and left feet. The x-ray showed osteoarthritis in both hands. On September 15, 2011, Dr. Cleland recommended water aerobics and low impact exercise for her joint problems. (Tr. 741-60.)

On September 10, 2011, Todd M. Craig, M.D. started plaintiff on Topamax for her chronic headaches. (Tr. 898.)

Plaintiff continued to see Dr. Jones throughout 2012 and per previously stated her notes do not detail plaintiff's medical issues and are substantially illegible. (Tr. 947-53.)

On January 18, 2012, Jamie T. Haas, M.D. saw plaintiff for a follow-up visit after another sleep study was conducted on January 12, 2012. No obstructive sleep apnea or narcolepsy was noted. Dr. Haas diagnosed depression, restless leg syndrome, irritable bowel syndrome, sleep apnea, fibromyalgia, headaches, and obesity. Plaintiff's current medications included Ambien, Mirapex, Adderall, clorazepate dipotassium—for anxiety, Fluocinonide—a cream for skin conditions, Lo Loestrin—birth control, and Neevo Dha—a vitamin supplement. (Tr. 770-73.)

On April 17, 2012, Dr. Haas added Savella, for fibromyalgia, and Trileptal, an anti-seizure medication, and increased plaintiff's Adderall dose. (Tr. 762-65.)

On October 3, 2012, Dr. Craig changed plaintiff's medication for chronic headaches to Depakot. (Tr. 916.)

A state ordered exam was performed on December 17, 2012 by Paul W. Rexroat, Ph.D. In his December 31, 2012 report he found that plaintiff "is able to understand and remember simple instructions. She can sustain concentration and persistence with simple tasks. She has moderate limitations in her abilities to interact socially and adapt to her environment." She has moderate limitations in daily living activities. Dr. Rexroat diagnosed her with major depression and anxiety and gave her a GAF score of 51. (Tr. 1041-44.) This GAF score indicates plaintiff has "moderate symptoms or moderate difficulty in social, occupational, or school functioning."[2]

Dr. Jones's typed notes from May 8, 2013 indicate that plaintiff has a major depressive disorder, but that she has a GAF score of 60. Dr. Jones had assess plaintiff with this score on January 21, 2013, December 21, 2012, and October 24, 2012. A GAF score of 60 indicates a person has "moderate symptoms or moderate difficulty in social, occupational, or school functioning."[3] (Tr. 1096-1106.)

On June 26, 2013, Dr. Haas completed a social security disability assessment and stated plaintiff's narcolepsy and insomnia were controlled by medications. Furthermore, the doctor opined that plaintiff has no work related restrictions. (Tr. 1073-74.)

On July 25, 2013, Dr. Jones provided a social security disability assessment stating that plaintiff's mental impairments would inconsistently affect her work performance, but provided little legible details as to why or how. (Tr. 1094-95.)

In an undated social security disability assessment, Dr. Harris stated that plaintiff had hypersomnia with possible narcolepsy, insomnia, and mild sleep apnea. But he listed no restrictions on her abilities to function and maintain employment. (Tr. 272.)

**First ALJ Hearing**

The ALJ held plaintiff's first hearing on August 10, 2010. (Tr. 37-52.) Plaintiff attended with her counsel present and testified to the following facts. She lives with her

---

[2] Id.
[3] Id.

parents in Union, Missouri. She completed the twelfth grade and a year of business college. Her last employment was with a mortgage company as a collection officer. She also worked as a store manager, and as a hotel front desk clerk. (Tr. 40-41.)

She was diagnosed with mild sleep apnea and/or narcolepsy (the records are conflicting), hyper-somnolence, and periodic limb movement, a major affective disorder. With regards to her sleeping disorders she is not using her prescribed CPAP machine, because she could not adjust to the dryness it caused her. She took several medications for her sleep disorders, but stated they make her nauseous or extremely tired. She continues to nap during the day and does not do much to help out around the house without getting tired. (Tr. 40-45.)

She estimates her depression began in 2005 and has worsened. She described an inability to concentrate and forgetfulness that prevented her from working. She is currently seeing Dr. Georgia Jones for medication management but she is not seeing anyone for counseling or therapy reportedly due to issues with Medicaid. She reports her concentration and memory are still poor. She cannot be around people because she reports being very nervous and uncomfortable. She has crying spells once or twice a day and does not cope with stress very well. She claims her parents help her make all life decisions. (Tr. 45-47.) She does not visit with anyone and rarely leaves the house, except for her doctor appointments and occasional shopping trips with her mother. (Tr. 49.)

Plaintiff testified she does not drive, although she does maintain a valid Missouri driver's license. She can sit for approximately an hour before having to walk around. She can stand for only fifteen minutes and can possibly walk a quarter of a mile. She approximates she can only lift between 15 and 20 pounds. (Tr. 48-50.)

**Second ALJ Hearing**

After remand from the district court for consideration of additional medical evidence and the acquisition of a vocational expert's ("VE") testimony, the ALJ held a

second hearing on August 19, 2013. (Tr. 562, 616-17.) Plaintiff attended the second hearing and was represented by an attorney. (Tr. 568.)

According to plaintiff she sees Dr. Jones monthly and gets counseling from her during visits that can last from fifteen minutes to an hour. Her crying spells occur three or four times a week. She cannot concentrate, remember things beyond a few minutes, or complete tasks. Also, plaintiff reports avoiding people. She continues to experience significant side effects with her prescribed medications. She stopped seeing Dr. Harris and now sees Dr. Haas. (Tr. 568-71.) Her lack of ability to sleep at night is causing her to be lethargic during the day and take naps. She has recently been diagnosed with fibromyalgia by Dr. Cleland, and it now hurts to sit, stand, or walk. She admitted not being in full compliance with the medical orders of her doctors. She reports she has headaches three to four times a week brought on by stress, anxiety, and depression. She is nauseous, dizzy, and photophobic. The headaches "just go away" after three to four hours. Plaintiff continues to have restless limb syndrome at night which disrupts her sleep. She was prescribed an oral appliance, which she said she cannot afford at this time. She is currently driving herself around to run errands and can still walk around a quarter of a mile. She can stand for thirty minutes and lift around five to ten pounds. She reports it hurts to bend and stoop, as well as climb stairs. She stated this is due to her loss of muscle tone from her increasing obesity. (Tr. 574-80.)

Plaintiff states that she is not socializing at all, but the ALJ noted that she is on birth control and she has reported to her doctor that she was sexually active as late as April 29, 2013. Plaintiff first stated she had not socialized in seven to eight years, but then changed her statement to not socializing for at least two years. The ALJ also questioned plaintiff's honesty with regards to how much her parents have done to assist her. Plaintiff reported her parents have done everything for her since 2009, but plaintiff lived on her own as late as December 2012. Plaintiff stated her mother comes over every day to assist her when she did not live with them. (Tr. 581-84.)

Vocational Expert Robin Cook testified at the hearing via telephone. Plaintiff worked previously as a hotel manager, which is medium, skilled work; a hotel clerk, light semiskilled work; a tax clerk, light semiskilled work; a retail manager, medium skilled work; a glass framer, medium semiskilled work; and, a retail sales clerk, light semiskilled work. The ALJ assumed limitations of light exertional work, avoiding ropes, ladders, scaffolding, hazardous heights and machinery as well as only the ability to perform unskilled work. The VE found with those limitations plaintiff could no longer perform any of her previous work. (Tr. 585-88.)

However, given those limitations, the VE found plaintiff could perform as an office helper, which is unskilled, light work with 1,810 positions in Missouri and 83,250 nationally; a recreation aid, which is unskilled light work with 4,460 state-wide positions and 253,110 nationally; and, a housekeeping-cleaner which is unskilled and light work with 19,790 jobs in Missouri and 877,980 nationally. (Tr. 588.)

Plaintiff's counsel described a hypothetical person who needed breaks for rest and lunch which could last two hours or longer instead of the typical fifteen-minute breaks or thirty-minute lunch. The VE opined these limitations would mean a person could not perform any job in the national economy, because it is not consistent with the demand for competitive employment.

Plaintiff's counsel then defined "moderate limitations" as activity not totally precluded, but significantly impaired in terms of proficiency or the ability to sustain the activity over the course of a workday or work week. Counsel asked if a person with such "moderate limitations" in her ability to maintain attention and concentration; complete a normal work week; interact appropriately with the general public; coordinate or work in close proximity with others; or, respond appropriately to criticism, changes in the work setting, or work-related stressors could sustain employment. The VE responded that a person with those "moderate limitations" in that many areas would not be able to sustain competitive employment. (Tr. 589-90.)

## III. DECISION OF THE ALJ

On September 26, 2013 the ALJ found plaintiff not disabled. (Tr. 539-53.) At the first step the ALJ found that plaintiff met the insured status requirements through December 31, 2014 and had not been engaged in substantial gainful activity since June 8, 2009, her alleged onset date. (Tr. 541-42)

At the second step the ALJ found plaintiff had severe impairments, that have more than a minimal effect on her ability to engage in work: obesity, sleep apnea, periodic limb movement disorder, recurrent sinus infections, chronic rhinitis, affective disorder, chronic nausea, sleep disorder, recurrent headaches, and fibromyalgia. (Tr. 542.)

At step three the ALJ went through each impairment separately and compared plaintiff's symptoms to those listed in the Commissioner's List of presumptively disabling impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ found none of her disorders, alone or in combination met a presumptively disabling Listing.

Additionally the ALJ considered plaintiff's mental impairments in relation to "paragraph B" or "paragraph C" criteria[4] and found they are also not satisfied. Specifically, the ALJ found plaintiff has only mild restrictions in living her daily life and maintaining social functioning; only moderate difficulty maintaining concentration, persistence, and pace; and, has not had any periods of decompensation of extended duration. (Id.)

The ALJ then considered the entire record and determined plaintiff had the RFC to perform light work but must avoid climbing ropes, ladders, and scaffolds and avoid the hazards of heights and machinery. Plaintiff was also determined to be able to understand, remember, and carry out at least simple instructions. (Tr. 543.)

At Step Four, the ALJ found plaintiff unable to perform any past relevant work. (Tr. 551.)

---

[4] "Paragraph B and C" criteria are listed in 20 C.F.R. Subpt. P, app. 1, § 12.00.

Finally, at Step Five, the ALJ, with the testimony of the VE, found that plaintiff could perform work that existed in significant numbers in both the national and state economies. (Tr. 551-52.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary decision or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the

Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

### V. DISCUSSION

Plaintiff argues that the ALJ erred by both failing to give the proper weight and specify the weight given to the various medical opinions. Furthermore, plaintiff argues the ALJ improperly considered noncompliance with numerous prescribed treatments. This court disagrees.

**A. Weights of the various medical opinions**

Plaintiff argues that the ALJ erred in failing to give "controlling weight" to plaintiff's treating physician Dr. Georgia Jones's opinions. Additionally, plaintiff argues the ALJ was required to list the weight she gave to all of the medical opinions; in particular the December 31, 2012 opinion of consulting psychiatrist Dr. Rexroat.

The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." Id. at 1013 (quoting Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1997)). The ALJ is not required to rely on one doctor's opinion entirely or chose between the opinions. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011). Additionally, when a physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion can be of little evidentiary value. See Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012).

Regardless of the decision the ALJ must still provide "good reasons" for the weight assigned the treating physician's opinion. 20 C.F.R § 404.1527(d)(2).

The weight of other medical opinions, such as state consultant Dr. Rexroat, is determined by considering: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quality of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is also a specialist; and, (6) any other factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c)(1).

The ALJ does not, however, need not make a specific finding the treating physician's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" in order to refuse to give it "controlling weight." Prosch, 201 F.3d at 1014.

The ALJ gave "great weight" to Dr. Jones's July 25, 2013 Assessment for Social Security Disability, which stated that plaintiff only had mild impairments in work performance and moderate impairments in social interactions and adaptation. (Tr. 549, 1094-95.) The ALJ examined Dr. Jones's evaluation of plaintiff as a whole. (Tr. 548-49.) It showed an improvement in plaintiff's condition. Plaintiff was assigned a GAF score of 35 on July 22, 2010, which has since improved significantly. Dr. Jones assigned plaintiff a GAF score of 60 on May 18, 2013, which was steady since October 24, 2012. (Tr. 514, 970, 1096-1106.) The two different Assessments for Social Security Disability Claim forms differ significantly. The July 25, 2013 form shows significant improvement from the earlier, April 26, 2010 Assessment. The ALJ considered the change between the two assessments to make a determination of plaintiff's mental condition. The 2010 assessment stated plaintiff could not hold competitive employment due to decompensations, but did not describe these decompensations. (Tr. 433-34.) Furthermore, Dr. Jones's treatment and counseling notes are summary in nature and not detailed. (Compare Tr. 285-91, 410-19, 488-93, 511-14, 947-67 with Tr. 517-28.)

The ALJ also looked to other sources, including plaintiff herself, to assist in determining the severity of plaintiff's complaints. The ALJ considered both doctors Rexroat and Kresheck's opinions, but as consultative opinions they were given little weight. This weight is due to the fact both doctors had only seen plaintiff once and both visits were before the most recent assessment of plaintiff by Dr. Jones. (Tr. 549.) The ALJ gave great weight to Dr. Jones's July 25, 2013 assessment which incorporated plaintiff's entire treatment record, which showed improvement with time and medication. This combined with the other medical assessments and the discounting of plaintiff's own statements, formed the ALJ's opinion that plaintiff was not disabled by her mental impairments.

Therefore, the ALJ's determinations regarding the weight given to the medical source opinions are based in substantial evidence in the record as a whole.

### B. Impact of plaintiff's noncompliance with treatments

Plaintiff argues the ALJ did not find her disabled, as required by SSR 82-59, and improperly discredited her subjective complaints and testimony by considering plaintiff's noncompliance with various doctor recommended treatments.

Social Security Ruling 82-59 applies only to those cases where a claimant is otherwise disabled and the ALJ denies benefits because of the claimant's noncompliance Owen v. Astrue, 551 F.3d 792, 800 n.3 (citing Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001)) (emphasis added). Nevertheless, the ALJ lawfully considered plaintiff's noncompliance with the medical provider's recommended treatment or course of action.

When evaluating a claimant's subjective symptoms, using the Polaski factors[5], the ALJ must make a credibility determination. See Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005). An ALJ's findings regarding credibility will be upheld as long as they are

---

[5] These factors are: 1) the claimant's daily activities; 2) the duration, frequency, and intensity of the condition; 3) dosage, effectiveness, and side effects of medication; 4) precipitating and aggravating factors; and, 5) functional restrictions. Polaski v. Heckler, 739 F.3d 1320, 1322 (8th Cir. 1983).

"adequately explained and supported." Id. at 996. The claimant's own noncompliance with medical recommendations and prescribed treatments may be considered for various reasons, including credibility of subjective complaints. See e.g., Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (discrediting claimant's subjective complaints due to her noncompliance with prescribed diet and medications); Owen, 551 F.3d at 800 (discrediting a medical opinion because it failed to also consider claimant's noncompliance); Brown v. Barnhart, 390 F.3d 535, 540-41 (8th Cir. 2004) (finding no disability because claimant's hypertension could be controlled with medication, which she chose not to take). When considering noncompliance, the ALJ must consider why the patient declined to follow the physicians' recommendations. See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003).

In this case the ALJ considered each Polaski. factor.  The ALJ detailed plaintiff's daily activities and the factors which aggravated her conditions, as described by plaintiff in her testimony at both her first and second ALJ hearings. (Tr. 544.) Then the ALJ described, in length, plaintiff's varying prescribed medications, and treatments prescribed by plaintiff's doctors as well as the side effects plaintiff reported the various medications caused. (Tr. 544-49.) The ALJ then considered plaintiff's lack of credibility with regard to plaintiff's own assessment of her depression, sleep problems, pain, and functional limitations.

The ALJ assessed plaintiff with little credibility because of her inconsistent testimony between the two hearings; her subjective complaints which were at odds with the medical evidence; her subjective complaints which conflicted with admissions she made to her physicians; and her noncompliance with medical advice and treatment in light of the severity of her descriptions of her symptoms to be. (Tr. 549-51.) Although many instances of her noncompliance were due to the medications' effects on her, many were not. For example, nearly every doctor plaintiff saw noted she needed to lose weight, get more exercise, and eat healthier.  (Tr. 278, 421, 423.) Many of her doctors  expressed frustration at her lack of persistence in trying new medications and complying with

treatments. Dr. Harris stated on May 19, 2010, "[a]gain, she basically has been either off of her medicines or noncompliant with her medicines for a couple of months. We discussed this at length, and at this point, she does not want anything from me, and therefore, there is nothing I can do." (Tr. 721.) Dr. Hollander of Washington University's Allergy/Immunology Division stated on October 8, 2009, "[w]e have also explained to her that she will need to try these medications for a full month to see if they actually have any effect as using them only for a couple of days is not giving them a fair trial." (Tr. 396.) Dr. Wedner, again noted plaintiff's failure to comply on July 6, 2010, "[w]e have tried prescribing Nasacort nasal spray to the patient in the past; however, she says that any form of nasal spray makes her nauseous and she is unwilling to take them. Therefore, she has been prescribed daily saline nasal washes, although she admits to not doing the washes on a daily basis and was instructed that it will be necessary for her to do so and she has agreed to that." (Tr. 501.)

The ALJ adequately explained why plaintiff's subjective complaints were not credible. The ALJ's decision is supported by substantial evidence.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

S/ David D. Noce<br>
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 16, 2015.